**ALLIS–CHALMERS MANUFACTURING COMPANY, Appellant,**

v.

**WHITE CONSOLIDATED INDUSTRIES, INC., Appellee.**

**No. 17713.**

United States Court of Appeals
Third Circuit.

Argued March 28, 1969.

Decided July 18, 1969.

Rehearing Denied Sept. 9, 1969.

------◆------

S. Hazard Gillespie, Davis, Polk & Wardwell, New York City (Morris, Nichols, Arsht & Tunnell, Wilmington, Del., on the brief), for plaintiff-appellant.

George I. Meisel, Squire, Sanders & Dempsey, Cleveland, Ohio (Potter, Anderson & Corroon, Blaine T. Phillips, Wilmington, Del., Richard M. Donaldson, Cleveland, Ohio, on the brief), for defendant-appellee.

Before SEITZ, ALDISERT and STAHL, Circuit Judges.

## OPINION OF THE COURT

STAHL, Circuit Judge.

This appeal by Allis-Chalmers Manufacturing Company, appellant, pursuant to 28 U.S.C.A. § 1292(a) (1), is from an order of the district court[1] denying Allis-Chalmers' application for preliminary relief against allegedly threatened violations of the antitrust laws.

In December 1968, White Consolidated Industries, Inc., appellee, "a diversified manufacturer, specializing in a wide variety of machinery and equipment, household appliances, and industrial supplies," 294 F.Supp. at 1265, purchased 31.2% of the outstanding stock of Allis-Chalmers from Gulf and Western Industries. The avowed purpose underlying White's stock purchase is the acquisition of Allis-Chalmers,[2] and to that end White proposes to make a tender offer to Allis-Chalmers stockholders in order to increase substantially its share of ownership.

## I. Proceedings in District Court

Alleging that White's acquisition of a substantial part of its stock and the proposed acquisition of additional stock constitute a violation of § 7 of the Clayton Act, 15 U.S.C.A. § 18, appellant Allis-Chalmers instituted the present action seeking a preliminary injunction to restrain White from acquiring any additional stock and from exercising its present share of ownership in any manner that would accomplish its takeover purpose.

After Allis-Chalmers filed its verified complaint, App. 5a, the district court issued an ex parte temporary restraining order prohibiting White from "directly or indirectly soliciting, contacting or communicating by public announcement or otherwise with other shareholders of Allis-Chalmers Manufacturing Company, or any other person, for the purpose of acquiring additional stock in Allis-Chalmers Manufacturing Company or announcing an intention of acquiring or of taking steps to acquire additional stock in Allis-Chalmers Manufacturing Company. * * *"[3] By agreement of the parties that order was extended until such time as the district court rendered a final decision on the application for preliminary injunction.

In response to the complaint of Allis-Chalmers, White filed a verified answer, App. 28a, and both parties submitted numerous affidavits and exhibits. The decision of the district court was based on the documents presented and on a hearing held on January 14, 1969, which

1. 294 F.Supp. 1263 (D.Del.1969).

2. In a form filed with the Securities and Exchange Commission subsequent to its acquisition of the Allis-Chalmers stock (Schedule 13D, Item 4, *Purpose of Transaction*), White stated that "the ultimate purpose underlying the purchase by White described herein is the acquisition of the business of the issuer * * *", i. e.,

Allis-Chalmers. Appendix (App.) 53a. In addition, White's President, Edward S. Reddig, indicated to Allis-Chalmers' officers that White's objective was to obtain complete ownership and control of Allis-Chalmers, *id.* at 52a; affidavit of David C. Scott, President of Allis-Chalmers, *id.* at 72a.

3. 294 F.Supp. at 1265 n. 1.

was limited almost exclusively to oral argument by counsel.[4]

On the basis of the affidavits, exhibits and legal arguments advanced by counsel, the district court concluded that appellant Allis-Chalmers had failed to demonstrate a reasonable probability of success on a final trial of the antitrust issues and hence denied preliminary injunctive relief.[5]

For the reasons hereafter set forth, I believe a preliminary injunction should have been granted.[6]

### a. *The Clayton Act*

Section 7 of the Clayton Act, as amended in 1950, prohibits a corporation engaged in commerce from acquiring "directly or indirectly, the whole or any part of the stock * * * of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition, may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C.A. § 18. The legislative history of the 1950 amendment indicates clearly the Congressional concern with "a rising tide of economic concentration in the American economy," Brown Shoe Co. v. United States, 370 U.S. 294, 315, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).[7]

---

4. App. 323a–403a.

5. Note 1, *supra.*
 The initial opinion was issued January 22, 1969. On January 24, 1969, the district court, App. 45a, 46a,
 (1) denied a motion for reconsideration of its January 22, 1969, dismissal of the application for a preliminary injunction,
 (2) refused to continue a stay on any further action by White to consummate a takeover pending an appeal to this court, and
 (3) vacated the temporary stay it had granted pending that court's own decision. (See text accompanying note 3, *supra.*)
 On February 3, 1969, after Allis had filed its appeal, this court denied appellant's motion for a temporary restraining order pending our final decision.

6. Because of the posture of the case, with an Allis-Chalmers annual stockholders' meeting scheduled for May 14, 1969, we issued an order on May 5, 1969, postponing the meeting. The order stated:
 It appearing that the above appeal came on for argument on March 28, 1969, following an accelerated schedule for briefing and argument, and it appearing that the determination of the issues presented in this appeal may affect the annual stockholders' meeting of Allis-Chalmers Manufacturing Company scheduled for May 14, 1969, and it appearing that it is not feasible for this court to file its opinion on the merits of the appeal prior to the scheduled date of such meeting,
 It is ORDERED that the meeting of the stockholders of Allis-Chalmers Manufacturing Company originally scheduled for May 14, 1969 be and is hereby directed to be postponed until further order of this court.
 Our action is supported by Studebaker Corp. v. Allied Products Corp., 256 F. Supp. 173, 192 (W.D.Mich.1966), where the court said: " * * * That federal courts have power to postpone annual meetings is clear * * *." *See also* Vanadium Corp. of America v. Susquehanna Corp., 203 F.Supp. 686, 699 (D.Del. 1962).

7. For a comprehensive discussion of the legislative history of the 1950 amendment, see Brown Shoe Co. v. United States, 370 U.S. 294, 311–323, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The Court said that Congress "hoped to make plain that § 7 applied not only to mergers between actual competitors, but also to vertical and conglomerate mergers whose effect may tend to lessen competition in any line of commerce in any section of the county.[31]
 * * * [I]t is apparent that a keystone in the erection of a barrier to what Congress saw was the rising tide of economic concentration, was its provision of authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency. Congress saw the process of concentration in American business as a dynamic force; it sought to assure the Federal Trade Commission *and the courts* the power to brake this force at its outset and before it gathered momentum.[32] " (Emphasis added.) 370 U.S. at 317–318, 82 S.Ct., at 1520.
 In notes 31 and 32 in the above excerpts from *Brown Shoe*, the Court emphasized:
 That § 7 was intended to apply to all mergers—horizontal, vertical or conglomerate—was specifically reiterated by the

In developing the criteria for determining the anticompetitive effects of mergers and acquisitions, the Supreme Court has made it abundantly clear that the focus is on "probabilities, not certainties. * * * Mergers with a probable anticompetitive effect were to be proscribed by this Act." *Id.* at 323, 82 S. Ct., at 1523. (Emphasis added.) And, more recently, in FTC v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967), the Supreme Court again noted that § 7 is designed to thwart anticompetitive practices in their incipiency, and that that policy would be frustrated by a "requirement that the anticompetitive power manifest itself in anticompetitive action before § 7 can be called into play." *Id.* at 577, 87 S.Ct., at 1229.

b. *Application for Preliminary Relief*

Basing its action on § 7 of the Clayton Act, Allis-Chalmers alleged that its acquisition by White would substantially lessen competition in each of several lines of commerce. Injunctive relief was sought under § 16 of the Clayton Act, 15 U.S.C.A. § 26, which empowers a federal court to grant relief in a private action,

> against threatened loss or damage by a violation of the antitrust laws * * *

> House Report on the final bill. * * * [and]
> That § 7 of the Clayton Act was intended to reach incipient monopolies and trade restraints outside the scope of the Sherman Act was explicitly stated in the Senate Report on the original Act. * * *.
> The Court also said:
> * * * .Congress neither adopted nor rejected specifically any particular tests for measuring the relevant markets, either as defined in terms of product or in terms of geographic locus of competition, within which the anticompetitive effects of a merger were to be judged. Nor did it adopt a definition of the word "substantially," whether in quantitative terms of sales or assets or market shares or in designated qualitative terms, by which a merger's effects on competition were to be measured. [Footnote omitted.]
> * * * [W]hile providing no definite quantitative or qualitative tests

when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity * * * and upon the execution of proper bond against damages from an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, * * *.

Thus, as the district court noted, "injunctive relief is particularly suited to the preventive function of § 7 and Congress has expressly extended the availability of the injunctive remedy to private parties * * *." 294 F.Supp. at 1265. The Supreme Court has declared "that the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws * * *." Perma Life Mufflers Inc. v. International Parts Corp., 392 U.S. 134, 139, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). *See also* Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed. 2d 129 (1969).

Recognizing that preliminary relief is a serious remedy,[8] and because ap-

> * * * [for substantiality], Congress indicated plainly that a merger had to be functionally viewed in the context of its particular industry * * *. [The Court then proceeded to identify certain "aspects," or economic factors, which should "properly be taken into account."] 370 U.S. at 320–322, 82 S.Ct. at 1521.
> For other discourses on legislative intent, *see* United States v. Von's Grocery Co., 384 U.S. 270, 275, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966) ; Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 741 n. 5 (2d Cir. 1953) ; United States v. Bethlehem Steel Corp., 168 F.Supp. 576, 582 (S.D.N.Y.1959) ; Thomas, Conglomerate Merger Syndrome—A Comparison: Congressional Policy With Enforcement Policy, 36 Ford.L.Rev. 461, 539–560 (1968).

8. In merger cases at least, preliminary relief may often have a "final" effect as the parties may abandon their plans rather

plication for such relief, particularly in a complex case, is often based on a record less comprehensive than that which a full adjudication would yield, the courts have required that a plaintiff show a reasonable chance of ultimately prevailing on the merits. In an action by a private party, the plaintiff must also show that it will suffer irreparable injury unless relief is granted. Note, 40 N.Y.U.L.Rev. 771, 778 (1965).

In a case in which the Government sought to enjoin corporate acquisitions which allegedly violated § 7 of the Clayton Act, we said that,

> * * * The United States is required to establish at the present stage of this case * * * the probability of a lessening of competition and a showing of a *reasonable probability of success* on final hearing * * *. (Emphasis added.) United States v. Ingersoll-Rand Co., 320 F.2d 509, 525 (3d Cir. 1963).

The burden so imposed is warranted by the extraordinary nature of the relief which is sought. But I am also mindful of the fact that it is preliminary relief which is being requested, and if the moving party establishes a reasonable probability of a § 7 violation the "possibility that the court may decide the right to permanent relief adversely to plaintiff does not preclude it from granting the temporary relief * * *." Bergen Drug Co. v. Parke-Davies Co., 307 F.2d 725, 727 (3d Cir. 1962). (In *Bergen* we reversed the denial of preliminary relief by the district court in a private antitrust action).

To the same effect, Judge Biggs, speaking for this court in *Ingersoll-Rand,* said:

> * * * We wish to make clear, however, * * * that there has been

no final hearing; that the facts, after final hearing, when the defendants have had a chance to consummate their defense or defenses in full, may appear of different substance and texture and possess very different legal effects * * *. 320 F.2d at 523.

Of similar import is Judge Bryan's explanation of a district court's function when preliminary relief under the Clayton Act is requested and granted:

> * * * [O]n this motion for a preliminary injunction the ultimate merits of any of the substantive issues are not before me for determination. Indeed, they could not be determined on this limited record.
>
> * * * * * *
>
> It should be noted, of course, that nothing said in this opinion is to be taken as an attempt to determine finally any aspect of the ultimate merits of this case. The ultimate merits remain fully open for determination at trial. United States v. Atlantic Richfield Co., 297 F.Supp. 1061, 1067, 1074 (S.D.N.Y.1969).

### c. *Status of the Parties*

Allis-Chalmers is a large manufacturing company with annual sales of $821,000,000 during 1967.[9] With 18 plants and more than 30,000 employees, Allis is a major manufacturer of diverse capital goods and equipment for numerous industries, and is also a major manufacturer of construction and agricultural machinery and electrical generation, transmission, distribution and utilization equipment.

White is also a highly diversified manufacturer, with total sales of approximately $825,000,000 in 1968. White's tremendous growth in recent years has resulted in large part from a series of ac-

---

than await the outcome of protracted and costly litigation. See Note, 40 N.Y.U.L. Rev. 771, 772 n. 7 (1965).

For a discussion of the showing required before a preliminary injunction will issue in a § 7 case, see *id.* at 774-777.

9. According to the complaint which the Federal Trade Commission has indicated

its intention to issue against White unless a consent agreement is reached, discussed further in the text accompanying note 28, *infra,* Appellant's Reply Brief A2, Allis, "presently ranks about 100th among the nation's industrial corporations, * * *" *Id.* at A7.

quisitions,[10] one of the most recent being the 1968 acquisition of Blaw-Knox Company. Blaw-Knox is a major producer of foundry and mill machinery products, finishing and processing lines for the steel and non-ferrous metal industries, steel castings, material handling equipment and construction equipment. In addition, a significant part of Blaw-Knox's net sales are derived from the design and construction of chemical plants. Blaw-Knox's sales volume approximates $200,000,000 per year.[11]

10. * * * Originally a manufacturer and seller of sewing machines, since 1950 White has expanded and diversified through 32 acquisitions to its present rank as approximately 100th among the nation's largest industrial corporations. Its major acquisitions were made between 1965, when its annual sales were still only $54.7 million, and 1968, when its annual sales reached $825 million. Its 32 acquisitions since 1950 are as follows:

| Company Acquired | Year Acquired |
|---|---|
| 1. The Apex Electric Manufacturing Company | 1956 |
| 2. Strong, Carlisle & Hammond Company | 1956 |
| 3. Boyer-Campbell Company | 1957 |
| 4. McAlear Manufacturing Corporation | 1960 |
| 5. Murray W. Sales & Co. | 1960 |
| 6. Fibreglass Ohio, Inc. | 1961 |
| 7. Davis Regulator Company | 1962 |
| 8. Wilgus Manufacturing Company | 1962 |
| 9. Jerguson Gage & Valve Co. | 1963 |
| 10. Schade Valve Manufacturing Co. | 1963 |
| 11. Humming Sewing Machine Limited | 1964 |
| 12. Reading-Pratt & Cady Division American Chain & Cable Company, Inc. | 1964 |
| 13. Robinson Orifice Fitting Co. | 1964 |
| 14. Sarco Company, Inc. | 1964 |
| 15. Tessler Sewing Machine Co. | 1964 |
| 16. Finishers Supply Company | 1965 |
| 17. Leland-Gifford Co. | 1965 |
| 18. Marsh Valves Company | 1965 |
| 19. Standard Sewing Equipment Corporation | 1965 |
| 20. Worcester Valve Co. | 1965 |
| 21. Rivett, Inc. | 1966 |
| 22. Roller Reinforced Plastics, Inc. | 1966 |
| 23. Scott & Williams, Incorporated | 1966 |
| 24. Whitin Machine Works, Inc. | 1966 |
| 25. Davidson Division Fairchild Camera and Instrument Company | 1967 |
| 26. Hupp Corporation | 1967 |
| 27. The Lees-Bradner Company | 1967 |
| 28. Blaw-Knox Company | 1968 |
| 29. The Bullard Company | 1968 |
| 30. Franklin Appliance Division Studebaker Corporation | 1968 |
| 31. Hamilton Manufacturing Company | 1968 |
| 32. Kelvinator Division American Motors Corporation | 1968 |

As a result of these acquisitions, White's business is oriented largely to the manufacture and sale of machinery, both electrical and non-electrical, * * * *Id.* at A5–A7.

———◆———

11. Blaw-Knox's 1966 net sales exceeded $250,000,000, while its 1967 net sales were approximately $200,000,000: Exhibit 6 of Scott affidavit, which consists of a letter and report White sent to its shareholders concerning its Blaw-Knox acquisition.

Allis-Chalmers alleges that its acquisition by White would have unlawful anticompetitive effects in some 20 separate lines of commerce. While the proposed acquisition might best be characterized as a conglomerate one, Allis maintains that there are also economically significant and adverse horizontal and vertical effects. (The proposed combination here has some of the attributes of what Professor Turner has called a "mixed conglomerate,"—"the acquisition of a company manufacturing a different product which is nevertheless related to a product or products of the acquiring firm because it can be produced with much the same facilities, sold through the same distribution channels, or made a part of the same research and development efforts." Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1315 (1965) ). Further, Allis contends that the lower court failed to consider and make findings of fact with respect to many of the alleged anticompetitive consequences which an acquisition by White would have.

### d. *Basis for District Court Decision*

In its opinion, the district court dealt specifically and primarily with three of the arguments advanced by Allis, evidently relating to issues which were emphasized at the oral argument:

#### *Electric Home Appliance Market*

(1) As to Allis' contention that it is a likely entrant into the electrical appliance home market where White is a substantial manufacturer, the district court found the evidence insufficient to establish imminent entry or any significant effect on market behavior resulting from an awareness by appliance manufacturers that Allis was a potential entrant.[12]

#### *Machine Shop Capability*

(2) Allis-Chalmers also argued that a White acquisition would eliminate actual and potential horizontal competition in a line of commerce denominated as "large custom machine shop capability." Allis possesses a great deal of machinery and equipment, such as very large boring machines and lathes, capable of manufacturing a wide range of industrial items. Because Allis does not run its giant machine shops at full capacity, it seeks to take advantage of the unique equipment it has by selling "open time" on its machine shop facilities. Contending that the sale of "open time" is a meaningful line of commerce, that it possesses 15% of the nation's total giant machine shop capacity, and that White possesses similar facilities of about 5% of the national capacity, Allis argues that a combination of the two companies would eliminate present horizontal competition in the sale of open time by giant machine shops.

The district court treated the term "large custom machine shop capability" as referring to the capacity to manufacture a wide range of products and did not consider such capability per se as a dis-

---

12. It is interesting to note that the proposed complaint by the Federal Trade Commission lists the potential entry of Allis-Chalmers into the area of the manufacture and sale of major electrical home appliances, coupled with White's important position in the field by acquisition of Kelvinator and several other appliance manufacturers, as one of the grounds for the Commission's possible action. Appellant's Reply Brief, A8.

One of the problems appellant seemed to have with respect to this particular area was a reluctance to disclose the details of its negotiations with a potential European manufacturer-licensor of such appliances except in an *in camera* proceeding, to which the appellee and the district court would not entirely agree. App. 397a–398a. I do not take issue with the apparent rejection of this requested procedure, and it may be that on the hearing for a permanent injunction appellant's reluctance would evaporate when the chips are down. At any rate, it should be made clear that my conclusion that there is a sufficient basis in the record to support a determination of probable success on the merits is not predicated in any important degree on appellant's claimed potential entry into the electrical home appliance field. Perhaps this issue, if developed, with more certitude at a hearing on remand, will tend to buttress the anticompetitive effect of the acquisition or merger proposed by White.

tinct line of commerce. Thus, the court was willing to examine into specific categories of products which each company could produce with this "capability," but absent such information the court was unable or unwilling to evaluate the anticompetitive effects, if any, in any relevant markets.[13]

### Potential Entry Into Market—Metal Rolling Mills

(3) The third area with which the lower court concerned itself in its opinion was the manufacture and construction of metal rolling mills. Blaw-Knox, a recent White acquisition, is one of the leading manufacturers of such mills. Allis contends that its own entry into that line of commerce is sufficiently probable to warrant restraint of White's projected takeover. The district court, on the other hand, found insufficient Allis' contentions that it was a potential entrant into this field, and further found that Allis did not stand "close enough to the edge of the metal rolling mill market to exert a competitive influence on others in that industry." 294 F.Supp. at 1268.

The court's conclusion was based in large part on its failure to find sufficient evidence, beyond an assertion by Allis management, that entry into the rolling mill industry is contemplated. In addition, the court noted the absence of evidence in the record to confirm that Allis has the technological or financial capacity to enter the market or the ability of the market to support an additional competitor.

From my review of the record I think further inquiry into Allis' status as a potential entrant into this industry is warranted. *See* United States v. Wilson Sporting Goods Co., 288 F.Supp. 543, 549 (N.D.Ill.1968). The uncontroverted affidavits disclose that not only has Allis manufactured components and sub-assemblies of complete metal rolling mills for Blaw-Knox but also that Blaw Knox has indicated to Allis its belief that the latter presently has the appropriate facilities and capability to manufacture a complete 10 or 12-inch rolling mill. App. 146a. Also, in an affidavit, the General Manager of Allis' Process, Equipment and Systems Division states that he has been negotiating with a European firm to obtain a license [14] to enable Allis to

---

13. The proposed FTC complaint makes no reference to "large custom machine shop capability." In my view, "machine shop capability," though a *service* rather than a *product*, may nevertheless be considered a line of commerce within the purview of the Act and I believe this matter should be reviewed again by the district court on rehearing. *Cf.* United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), and United States v. Manufacturers Hanover Trust Co., 240 F.Supp. 867 (S.D.N.Y. 1965), where banking services were held to be a line of commerce within § 7 of the Clayton Act.

In discussing the bank cases, the Supreme Court in United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), a Sherman Act case, involving a monopoly in the burglar alarm service field, said:

* * * We see no reason to differentiate between "line" of commerce in the context of the Clayton Act and "part" of commerce for purposes of the Sherman Act * * *. 384 U.S. at 573, 86 S.Ct., at 1705.

The analogy to the Sherman Act is significant as there have been cases under that statute involving a "part" of commerce consisting of *services*. See, *e. g.,* the line of Fourth Circuit cases dealing with the allocation of "selling time" in warehouses to tobacco companies: Roberts v. Fuquay-Varina Tobacco Board of Trade, Inc., 332 F.2d 521 (1964), 405 F.2d 283 (1968); Danville Tobacco Association v. Bryant-Buckner Associates, Inc., 333 F.2d 202 (1964), 372 F.2d 634 (1967).

See also United States v. Tidewater Marine Service Co., 284 F.Supp. 324 (E. D.La.1968), in which the chartering of "service craft to transport men and supplies to the offshore oil industry," 284 F.Supp. at 328, a service, was implicitly considered a line of commerce subject to the Clayton Act, although a proposed merger was found not to be violative of § 7.

14. Evidently this is a different European manufacturer than the one with which Allis is negotiating for the sale of electrical home appliances.

manufacture a continuous casting process and machinery for producing steel slabs. App. 293a, 294a. The process involved differs from those utilized by traditional rolling mills but is designed to produce the same end product.[15]

In accord with its conclusion that Allis-Chalmers had failed to demonstrate convincingly a reasonable probability of success on final trial, the district court denied the application for a preliminary injunction.

### e. *Irreparable Harm*

■ As previously explained, in order for a private party to prevail in an action for a preliminary injunction in an antitrust case, there must be a showing of irreparable harm. In this respect, therefore, it is important to note that had there been a showing by Allis-Chalmers of reasonable probability of success on final hearing of the § 7 issue, the district court indicated that preliminary relief would have been warranted.[16] The court was evidently of the opinion that the irreparable injury Allis would suffer if an injunction were denied outweighed the harm to White likely to result if relief were granted.

I am aware that the district court's discussion of the issue of irreparable injury, quoted in the margin, was somewhat gratuitous and, at a subsequent hearing on appellant's motion for reconsideration of the denial of relief, the court said that it had not gone into the question of irreparable harm as fully as it might have had there been a finding in Allis' favor on the § 7 issue.[17] Nevertheless, I believe the court's tentative resolution of the balancing of hardships in Allis' favor was warranted by and finds adequate support in the record. The affidavits submitted by Allis show that the threat of a White takeover has had an adverse effect on professional

---

15. The proposed Federal Trade Commission complaint states:

> * * * Allis presently supplies important components of rolling mill machinery to contractors of rolling mills *and is one of the most likely entrants into the manufacture and sale of rolling mill machinery.* White's acquisition of Allis' stock and plan to acquire its business may eliminate the potential competition offered by Allis in the rolling mill machinery market. * * * (Emphasis added; Appellant's Reply Brief, A10).

On the tests for potential competition or potential entry into market, see Brodley, Oligopoly Power Under the Sherman and Clayton Acts—From Economic Theory to Legal Policy, 19 Stan.L.Rev. 285, 357–359 (1967).

16. In the opinion below, 294 F.Supp. at 1268 n. 7, Chief Judge Wright said:

> The Court notes the following conclusions on the issue of irreparable injury: Where a party has satisfactorily demonstrated reasonable probability of establishing a § 7 violation on final trial of the issue, the Court should properly consider injury to the public as well as injury to the immediate parties in deciding whether a preliminary injunction should issue. See Vanadium Corp. of America v. Susquehanna Corp., supra, 203 F.Supp. at 696. Indeed, if probable anti-competitive effects may rea-

> sonably be expected to manifest themselves in the interim between denial of preliminary relief and final determination of the merits and those anti-competitive effects are irreversible, the injury to the public which, by definition, follows is entitled to considerable weight. See United States v. Wilson Sporting Goods Co., supra 288 F.Supp. at 568–570.

> After careful review of the record in this case, the Court is of the opinion that, had there been a showing by Allis-Chalmers of reasonable probability of success on final hearing of the § 7 issue, the Court would have been compelled to grant a preliminary injunction. Evaluation of future harm to the public and the parties is, of course, a highly speculative undertaking; however, the Court is convinced that the imminence of a White tender offer, the disruptive effects of unscrambling a White-Allis-Chalmers combination, and the probable injury to the public of such a combination (assuming it to be illegal), when considered together, would have justified injunctive relief.

> The Court reiterates that there has been no showing of probable success by Allis-Chalmers and that, therefore, the issue of irreparable injury is not in fact before the Court.

17. App. 429a.

and management employee recruitment, morale and performance, and has also had an adverse effect on Allis' business operations with customers withholding orders due to uncertainty of its future. App. 74a, 162a, 173a. Furthermore, important negotiations involving a proposed licensing agreement with a European producer to enable Allis to enter the home appliance field apparently have been stalled by the possibility of the acquisition by White. App. 76a, 77a.

In addition, serious harm to Allis might result if White nominees were to become members of Allis' Board of Directors, thus gaining knowledge of Allis' business or trade secrets, future plans, or other significant information, which would be "irreversible" in the event of ultimate divestiture. *See* Crane Co. v. Briggs Manufacturing Co., 280 F.2d 747, 750 (6th Cir. 1960).

Significant also is the financial impact a White takeover would occasion, as White has admitted that access to Allis' cash resources is necessary to finance White's acquisition of the Allis stock. App. 196a. While I am cognizant as well of the financial problems White will face as a result of a reversal of the lower court's action, I am of the opinion that the maintenance of the status quo is necessary to assure the viability of Allis-Chalmers as an independent, healthy entity should it ultimately prevail on the merits.

Further, White contended at the oral argument of the appeal before this court that the possible action by the Federal Trade Commission, discussed later, takes away the element of "future harm to the public" cited by the district court in its evaluation of the issue of irreparable injury. See note 16, *supra*. I agree with appellant, as asserted in its reply brief (pp. 5–6), that the opposite may be true. The possibility of action by the Federal Trade Commission makes the remedy of divestiture a more likely one in the event violation of the Clayton Act is found, and the "irreversible" anticompetitive effects which would result if a merger has in the meanwhile been consummated would truly be highly prejudicial to the appellant as well as to the public.

As was stated by the district court in United States v. Ingersoll-Rand Co., 218 F.Supp. 530, 542 (W.D.Pa), which we affirmed in 320 F.2d 509 (3d Cir. 1963):

> \* \* \* Considering the hardships of divestiture actions with their ramifications and complications and their painful impacts upon all whom they touch, it is hard to understand that such a device can be reasonably considered as the ultimate remedy to be employed here \* \* \*.

Relying on *Ingersoll,* the inadequacy of divestiture was reiterated by Judge Wortendyke in United States v. Chrysler Corp., 232 F.Supp. 651, 658 (D.N.J.1964). *See also* American Smelting and Refining Co. v. Pennzoil United, Inc., 295 F.Supp. 149, 157–158 (D.Del.1969).

While I take no position on the matter of divestiture at this time, there has been some doubt expressed as to whether such remedy is available in an antitrust action by a private party. Note, 40 N.Y.U.L. Rev. 771, 776 (1965). *Cf.* Note, 49 Minn. L.Rev. 267 (1964). If divestiture is unavailable or uncertain as an ultimate remedy should the present action remain a private party suit, there may be even more reason for affording preliminary relief to appellant at this stage.

## II. Reversal by This Court

On the question of whether there has been a showing of reasonable probability of success on final trial of the § 7 issue, I am compelled to disagree with the district court.

In United States v. Ingersoll-Rand Co., 320 F.2d 509, 523 (3d Cir. 1963), Judge Biggs said:

> \* \* \* We start, of course, with the fundamental proposition that the issuance of an interlocutory injunction rests within the sound discretion of the trial court and that its discretion may not be interfered with on appeal unless it has been exercised improvidently \* \* \*.

On the record before the district court, I am constrained to hold that it was improvident to conclude that there was not a reasonable probability of showing a violation of § 7 of the Clayton Act on final hearing and thus to deny preliminary relief.

■ While the lower court's conclusions with respect to the issues dealt with in its opinion have already been mentioned, certain other issues raised in the complaint and affidavits, and more fully developed in the briefs and oral argument in this court, sufficiently indicate, in my view, the probability that a White acquisition may substantially lessen competition in a number of relevant lines of commerce. (With the possible exception of the machine shop capability and large steel castings, the parties seem to be in agreement that for present purposes the relevant geographic markets are nationwide. The "nation as a whole" may be "a section of the country" within which to measure the anticompetitive effects of an acquisition or merger. United States v. Kimberly-Clark Corp., 264 F.Supp. 439, 455 (N.D. Cal.1967).)

■ Before discussing those issues, I should emphasize that the points I find persuasive were neither cogently nor forcefully presented to the district court at oral argument. Indeed, the district court's opinion dealt extensively with the major arguments which Allis' counsel presented to it in the lengthy oral hearing on January 14, 1969. But I believe that in our role as an appellate court, in an important case of this type having far-reaching economic consequences not only to the immediate parties but to the public as well, we are duty-bound to consider all issues properly raised by the complaint and having record support.

#### a. *Metal Rolling Mills—Blaw-Knox*

Turning to the merits of the alleged anticompetitive effects of a combination of White and Allis-Chalmers, the main areas of concern appear to involve White's Blaw-Knox subsidiary. I have already dealt with the issue of the potential entry of Allis into the metal rolling mill market. (See point (3), *Potential Entry Into Market—Metal Rolling Mills*, under the heading, *Basis for District Court Decision, supra.*)

#### *Product Extension*

As previously noted, Blaw-Knox is one of the major manufacturers of metal rolling mills. The record indicates that the manufacture of such mills is a distinct line of commerce and that the industry is a highly concentrated one. According to Allis the four major manufacturers of rolling mill machinery account for more than 80% of the market, Blaw-Know being the third largest supplier of such mills, with a market share approximating 20%.[18]

The electrical drives and controls which run rolling mills represent a significant part of the cost of a completed mill, comprising approximately one-third of the cost of a fully-installed mill. Other equipment and machinery in the mill account for another third of the total cost, the remaining third going for design, construction and buildings. Industry-wide shipments of rolling mill equipment and machinery, including electrical components, exceed $300,000,000 annually.[19]

The major mill manufacturers do not manufacture the electrical drive and control systems which form an integral part of the mill. The industry practice is for the mill purchaser to acquire the control components separately or through the mill manufacturer, with the latter

---

18. App. 146a; Exh. MM to affidavit of W. H. Davis.

According to the proposed complaint of the Federal Trade Commission, in 1963 the top four rolling mill machinery manufacturers accounted for 60% of the business and the top eight for 75% of all shipments. White was stated to be the third largest supplier of rolling mill ma-chinery in the country with 11% of the market in 1967, being one of only four companies supplying complete rolling mills. Appellant's Reply Brief, A10.

19. Exhibit MM to Affidavit of W. H. Davis. See also proposed Federal Trade Commission complaint, Appellant's Reply Brief, A10.

acting as the purchaser's agent. The major suppliers of the electrical control systems are General Electric, Westinghouse and Allis-Chalmers, and those three companies account for approximately 90% of the electrical equipment supplied for metal rolling mills. In terms of percentage figures, General Electric and Westinghouse account for over 80% of the sales, with Allis-Chalmers a distant third.

While the two leaders are presently Blaw-Knox's primary suppliers of electric drives for its rolling mills, over the past five years Allis has supplied approximately a half million dollars worth of such equipment to Blaw-Knox annually. App. 199a.

In addition to its major position in the rolling mill industry, Blaw-Knox also utilizes its significant engineering construction capability for designing and building complete industrial plants.

■ The probable anticompetitive effects of an Allis-Chalmers-Blaw-Knox (i. e., White) combination are significant. Blaw-Knox's design and construction capabilities and its position as a leading manufacturer of rolling mills, when coupled with Allis' position as the third largest supplier of the electrical drive components for such mills, would result in Blaw-Knox becoming the only company capable of designing, producing and installing a complete metal rolling mill. The emergence of a company offering such a complete product would raise higher the already significant barriers to the entry of others into the various segments of the metal rolling mill market. App. 111a–112a, 290a–293a. The potential entrenchment of the market power of a merged Allis-Chalmers-White industrial complex as a "full-line manufacturer" in the field of metal rolling mill machinery is an example of "product extension" consequences which may be anticompetitive and violative of § 7, as held in FTC v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303

(1967), General Foods Corp. v. FTC, 386 F.2d 936 (3d Cir. 1967), cert. denied, 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968), and United States v. Wilson Sporting Goods Co., 288 F.Supp. 543, 548 (N.D.Ill.1968). A "product extension merger" is a "merger that may enable significant integration in the production, distribution or marketing activities of the merging firms." 386 F.2d at 944.

*Procter & Gamble,* the *Clorox* case, is perhaps the principal Supreme Court decision in the conglomerate acquisition area. 386 U.S. at 583, 87 S.Ct. 1224. This court dealt with a "mixed" conglomerate merger in *General Foods* in an opinion by Judge Staley.

### Reciprocity

The major purchasers of rolling mills are steel companies. In the past few years Allis-Chalmers has purchased an average of $30,000,000 worth of steel annually from the ten steel companies which are Blaw-Knox's principal customers for its rolling mills. App. 294a, 295a. Allis' total annual purchases of steel mill products appear to be approximately $44,000,000.[20] When coupled with White's annual purchases of steel mill products, about $42,000,000 in value,[21] a White-Allis combination would buy a far larger amount of steel than any of Blaw-Knox's competitors in the rolling mill market. The danger to competition inherent in that market situation is not difficult to perceive.

■ An acquisition which creates a market structure conducive to reciprocal dealing presents the acquiring company with an advantage over competitors, an advantage which by its very nature is anticompetitive. See FTC v. Consolidated Foods Corp., 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965). And the reciprocal trading made possible by such an acquisition need not ensue "from bludgeoning or coercion." *Id.* at 594, 85 S.Ct. 1220. As we noted in United States v. Ingersoll-Rand Co., 320 F.2d 509 (3d

---

**20.** Proposed complaint of FTC, Appellant's Reply Brief, A10.

**21.** *Id.* at A11.

Cir. 1963), "the mere existence of this purchasing power might make its conscious employment toward this end unnecessary; the possession of the power is frequently sufficient, as sophisticated businessmen are quick to see the advantages in securing the good will of the possessor. * * * 'Reciprocity' * * * is particularly destructive of competition because it transforms substantial buying power into a weapon for 'denying competitors less favorably situated access to the market.'" *Id.* at 524, quoting from the district court opinion by Judge Rosenberg. *See also* United States v. General Dynamics Corp., 258 F.Supp. 36, 57 (S.D. N.Y.1966), in which the principle of reciprocity was applied in a conglomerate merger case.

The tremendous purchasing power of a White-Allis combine, coupled with Blaw-Knox's enhanced position in the rolling mill market, may foreclose White's competitors in the sale of rolling mill machinery to the steel industry.[22]

## Market Share

We must not forget that the Clayton Act comes into play where the effect of an acquisition "*may be* substantially to lessen competition, * * *"" (emphasis added; 15 U.S.C.A. § 18). As the Supreme Court has said, the concern of Congress was with *probabilities*, not certainties. Brown Shoe Co. v. United States, 370 U.S. 294, 323, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

▮ I do not mean to imply that § 7 prohibits diversification per se. But at this date there can be no doubt that § 7 was designed to arrest the rising tide of economic concentration and to curb, in its incipiency, a lessening of competition made probable by the possession of market power acquired via corporate acquisitions within the scope of § 7.[23]

22. To reiterate, the section of the FTC's proposed complaint dealing with reciprocity, Appellant's Reply Brief, A10–A11, asserts that,

(1) Allis-Chalmers buys approximately $44,000,000 in steel products annually;

(2) White is a major supplier of equipment to the steel industry in the area of rolling mills;

(3) White makes annual purchases of steel mill products of approximately $42,000,000;

(4) Thus a combine of Allis-Chalmers and White, as a large buyer of steel mill products and a substantial producer of rolling mill equipment, could compel the selection of an enlarged White company as a rolling mill supplier to the disadvantage of other rolling mill machinery producers. This is the essence of reciprocity.

On the relationship between oligopolistic market and reciprocity and the economic theory underlying it, see Brodley, Oligopoly Power Under the Sherman and Clayton Acts—From Economic Theory to Legal Policy, 19 Stan.L.Rev. 285, 327–329 (1967).

23. See note 7, *supra*.

As Judge Maris has aptly stated, " * * * it is the purpose of [§ 7 of] the Clayton Act to nip monopoly in the bud * * *." Transamerica Corp. v. Board of Governors of Federal Reserve System, 206 F.2d 163, 169 (3d Cir. 1953), cited with approval in United States v. E. I. du Pont De Nemours & Co., 353 U.S. 586, 592, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), and Luria Bros. & Co. v. FTC, 389 F.2d 847, 864 (3d Cir. 1968). *See also* E. I. du Pont, *supra* at 589, 77 S.Ct. 872, and Vanadium Corp. of America v. Susquehanna Corp., 203 F.Supp. 686, 695–697 (D.Del.1962).

In discussing the 1950 Celler-Kefauver amendment to § 7 of the Clayton Act, the Assistant Attorney General in charge of the Antitrust Division of the United States Department of Justice has said that while the Government has "nothing against conglomerate firms, as such, and indeed, we recognize that there is a great deal to be said for them * * * we are very concerned about * * * big-company mergers, and the galloping trend toward economic concentration." (Address by Richard W. McLaren before the Antitrust Section of the American Bar Association, March 27, 1969, Washington, D.C.). Mr. McLaren also discussed the 1950 amendment and presented his views on its applicability to conglomerates in testifying before a Congressional committee on March 12, 1969. See 5 CCH Trade Reg.Rep. ¶ 50,233.

It should be noted also that the Federal Trade Commission announced on April 8, 1969, a "merger notification program," requiring prior notice of proposed mergers

Applicable here is our statement in General Foods Corp. v. FTC, 386 F.2d 936, 945–946 (1967):

> * * * While it is not the aim of antitrust policy to merely preserve "competitive balance" per se, it assuredly is the aim of such policy to preserve whatever competition exists in a given industry, even if such competition be of an oligopolistic nature.

■ I have not dealt expressly with the matter of each party's share of the market in the lines of commerce under consideration as I do not believe the question of market shares is dispositive in the present preliminary stage of the proceedings, particularly in a conglomerate merger situation. In Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1315–1316 (1965), the author has stated:

> * * * The rules developed for determining the validity of horizontal and vertical mergers clearly will not do for conglomerate acquisitions generally. In the familiar types of horizontal and vertical merger cases, the Supreme Court has come to place important if not decisive weight on the share of the relevant markets controlled by the acquiring and acquired company. * * * But whatever significance can be attached to market shares in these cases, quite clearly the significance becomes less with conglomerate mergers, and indeed may completely vanish. * * *

Likewise, in United States v. Standard Oil Co. (New Jersey), 253 F.Supp. 196, 224 (D.N.J.1966), the court said, in discussing § 7 generally:

> * * * Measured solely and strictly in terms of mathematical percentage,

the immediate impact of acquisition of PCA upon competition in the United States potash market would not appear to be substantial, but such a narrow approach is not consistent with the objectives of Section 7 of the Act. Concentration in the industry, as well as the degree of existing competition, must also be considered * * *.

In United States v. Atlantic Richfield Co., 297 F.Supp. 1061. (S.D.N.Y.1969), which involved companies with very large assets and substantial economic power, the court nevertheless had this to say:

> * * * [M]arket shares are an important factor in considering the probable effects of a combination on effective competition in the relevant market. Of course such percentages are not the sole criterion.

> Among other important factors are industry trends toward concentration, * * * the degree of concentration in the industry, * * * the history of acquisition of the merging firms, * * * and entry barriers in the industry, * * *.

These factors must be viewed merely as guidelines in assessing anticompetitive effects which are likely to result from a merger. They of course cannot substitute for more extensive and detailed analysis at trial of the industry structure and the probable economic effect of the merger in the setting of the particular industry and the relevant geographic market. Brown Shoe Co. v. United States, 370 U.S. at 322 n. 38, 82 S.Ct. 1502, 8 L.Ed.2d 510. On a motion for preliminary relief such as now before me, detailed economic analysis of this nature is seldom before the

---

or acquisitions involving firms, having a certain volume of assets or combined assets, which are subject to the Commission's jurisdiction. 37 U.S.L.W. 1161, 2596 (Apr. 22, 1969).

 As is to be expected, the literature in this field is extensive and the views of the experts widely divergent. See, *e. g.*, Davidow, Conglomerate Concentration and Section Seven: The Limitations of the Anti-Merger Act, 68 Col.L.

Rev. 1231 (1968) (" * * * [T]his decade is rapidly emerging as the golden age of the conglomerates * * * "); Elman, Clorox and Conglomerate Mergers, 36 A.B.A. Antitrust L.J. 23 (1967); Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313 (1965); Brodley, Oligopoly Power Under the Sherman and Clayton Acts— From Economic Theory to Legal Policy, 19 Stan.L.Rev. 285 (1967).

court and cannot be expected. The other factors referred to above must therefore be heavily relied on in determining probability of success at trial. 297 F.Supp. at 1071–1072.

My concern here is primarily with the anticompetitive effects made probable by the entrenchment of already significant market power. The metal rolling mill and some of the other product markets involved in this case appear to be oligopolistic in structure, with either White or Allis being one of a small number of sellers who account for a significant share of the market. In light of such market structures, I think it proper to be less concerned, e. g., with the asserted small percentage of total steel purchases, nationwide, which a White-Allis combine would account for than with a comparison of the dollar volume of steel purchases by such a combine vis-a-vis the dollar volume of steel purchases by White's competitors in the manufacture and sale of rolling mills. See Davidow, Conglomerate Concentration and Section Seven: The Limitations of the Anti-Merger Act, 68 Col.L.Rev. 1231, 1237 (1968).

Thus, in discussing the doctrine of reciprocity, one commentator has stated:

> *Consolidated Foods* * * * indicates that in those mergers involving reciprocity a crucial inquiry will be whether the expected reciprocal buying will have an appreciable effect on the maintenance of oligopoly conditions *in the industry or industries involved.* It is possible that under certain conditions there may be no such effect, as where other firms are similarly diversified and can make equally effective demands on their supplier-customers. [Footnote omitted.] The issue, however, appears clear: whether the merger will be likely to maintain, intensify,

or create oligopoly conditions in the *relevant market.* (Emphasis added.) Brodley, Oligopoly Power Under the Sherman and Clayton Acts—From Economic Theory to Legal Policy, 19 Stan.L.Rev. 285, 327 (1967). (*See also* United States v. General Dynamics Corp., 258 F.Supp. 36, 64 (S.D.N.Y. 1966).)

#### b. *Construction Equipment*

On the basis of the facts disclosed thus far I believe Allis has met its burden of showing a reasonable probability of success on final hearing. But I note, in addition, other possible and probable effects of a White acquisition which are deserving of more extensive inquiry. As previously indicated, Allis is a leading manufacturer of a wide range of construction equipment, including tractors, scrapers, graders and other machinery used for road construction. By virtue of its recent acquisition of Standard Steel, Allis is now one of the nation's leading manufacturers of asphalt plants.[24] Blaw-Knox is a major manufacturer of asphalt pavers and a leader in that highly concentrated industry. The evidence indicates that asphalt plants and asphalt pavers are complementary items and are often used in conjunction for roadway construction. The "product extension" aspects of a White acquisition are deserving of scrutiny in light of Allis' position as a leading manufacturer of a broad range of construction equipment and its network of dealers who carry a wide range of such equipment. App. 137a.

#### c. *Steel Castings*

There may also be a possibly significant vertical aspect of the proposed acquisition. Allis manufactures large cone crushers, gyratory crushers, and grinding mills. One of the components for

---

24. The function of "asphalt plants" is described in ¶ 57 of the affidavit of Thomas L. Dineen, App. 136a:

At the actual construction site, plants and pavers are, of course, used in conjunction with one another. That is, the asphalt is mixed in a semiportable asphalt batching plant near the construc-

tion site, the asphalt is poured into trucks and taken to the pavers for spreading on the highways.

Appellant's brief, p. 18, states that the "asphalt batching plant is a semiportable plant which is moved around at the actual construction site."

that equipment is large steel castings, and White manufactures and is presently one of Allis' suppliers of such castings.[25] White's acquisition of Allis may foreclose White's competitors in the manufacture and sale of steel castings from selling to Allis, and may preclude Allis' competitors from obtaining large steel castings in times of short supply. The number of manufacturers of steel castings is small, and there is evidence that because of the transportation costs involved in shipping large castings the areas of meaningful competition among such sellers is less than nationwide. In fact, Allis alleges that because of cost and other considerations it now purchases castings in excess of thirty tons from but three suppliers, one of which is White.[26]

It should be emphasized that the trial judge, following the filing of appellant's complaint on December 18, 1968, and the answer of the appellee on January 8, 1969, was compelled to review an overwhelming mass of documentary materials and legal memoranda and conduct several hearings in which counsel for the parties presented oral argument, before disposing of the matter by the opinion of January 22, 1969 and the denial of the motion for reconsideration on January 24, 1969.[27] My disagreement with the result which the district court reached, therefore, in no way detracts from the masterful task the court performed in dealing expeditiously with this complex and newly developing field of the law of conglomerate acquisitions and mergers.

### III. Proposed FTC Complaint

It should be pointed out also, in fairness to the district court, that over a month following its decision and while the case was pending on appeal to this court, the Federal Trade Commission declared its intent to file a complaint against White for violation of § 7 of the Clayton Act unless a consent agreement is reached with the Commission.[28] See

---

25. See Dineen affidavit, App. 131a–134a; Reddig affidavit, Exhibit C.

26. App. 131a.

27. Judge Frankel has characterized in pithy fashion the plight of a district judge, in sweeping antitrust actions of this nature, as being required to hear and consider such cases "with all inconvenient speed * * *" Lunkenheimer Co. v. Condec Corp., 268 F.Supp. 667 (S.D.N.Y. 1967).

28. We were advised at oral argument that discussions were under way between the Federal Trade Commission and appellee White, and we have not been informed as to the status of the matter at this time.
 So that the story on the FTC investigation will be complete, I am including the following colloquy between the court and counsel at the commencement of the January 14, 1969, oral argument below:
 Mr. Arsht [counsel for Allis-Chalmers]: One other introductory matter that I would like to mention is, as your Honor knows from the record in this case, the Federal Trade Commission is in the midst of a proceeding, an investigatory proceeding having to do with the defendant's ownership of this block of stock of the plaintiff. We have been informed that the Federal Trade Commission is interested in this proceeding and is following its course in the court.
 The Court: Mr. Arsht, I haven't heard a thing from the F. T. C. and it doesn't make any difference whether they are interested or not. If they are interested, they can come here and do something about it. They are not here. And since they are not here, forget about it.
 Mr. Arsht: May I say one or two additional sentences in regard to that. We are advised that it is the policy or practice of the Federal Trade Commission not to affirmatively initiate an appearance by it or an intervention by it in private litigation such as this but that if the Court should indicate an interest in a statement from the Federal Trade Commission of its position or a report of the status of its investigation—
 The Court: What good would that do if they haven't made the investigation?
 Mr. Arsht: I don't know, your Honor.
 The Court: I don't think it is up to me to inquire of them. If they want to get in touch with me and have anything to say about it, I think they can either come to court or they can write a letter and advise counsel by copies of the letter. If they think that this is so serious, they have their method of doing something about it. They can either go

Appellant's Reply Brief A2, A5. While we cannot give excessive weight to a complaint which the Federal Trade Commission has indicated its intention to file, I believe it is proper to take note of the Commission's exploration of the proposed takeover by White, particularly because, as asserted by appellant, the Federal Trade Commission must have "reason to believe" that there is a violation of the Clayton Act before issuing a complaint. 15 U.S.C.A. § 21(b).[29]

I have previously adverted to some of the items in the proposed Federal Trade Commission complaint. I cite the following statement from the complaint, presumably designed to meet the statutory "reason to believe" requirement, as conforming to my own view on the probability that the appellant will prevail on the merits:

> There is a vital connecting link between growing aggregate concentration and the market power conferred by concentration in individual markets. Many of the largest conglomerate corporations occupy leading positions in numerous industries, particularly the most concentrated ones. These positions confer economic power and potential economic advantage beyond that associated with sheer bigness alone. Vast, multimarket enterprises may be able to achieve market power from subtle arrangements, as by the new reciprocity opportunities created by the merging of White and Allis. A combination of White and Allis will constitute the fourth largest merger or acquisition involving manufacturing companies in the U.S. since January 1, 1967, and will significantly increase concentration in the manufacturing sector of the economy. This combination, furthermore, combines two firms which operate across many industries and which have oligopoly power in a total of at least twenty such industries. * * * The resulting accumulation of oligopoly power in numerous markets may result in the mutual entrenchment of unhealthy market situations and the enhancement of the new combination's power to pursue anticompetitive practices in any of its markets by selectively applying oligopoly power against less powerful firms. White's acquisition of Allis's stock therefore may substantially lessen competition or tend to create a monopoly in violation of § 7 of the Clayton Act, as amended (15 U.S.C. § 18), and its plan to acquire the business of Allis constitutes an unfair method of competition in violation of Section 5 of the Federal

to the United States Attorney, the Attorney General, and come to this Court, or they can go to the Circuit Court of Appeals and ask for injunctive relief. If they feel badly about it, that is too bad.

Mr. Arsht: Well, I have stated what I have been informed is their practice, namely, that if the Court invites them to state their position or if the Court authorizes counsel for the parties to extend the Court's invitation for their participation, they will respond accordingly but will not themselves initiate the intervention or the participation in the case.

The Court: I am afraid they couldn't help this Court very much at this stage of the proceedings. * * * App. 325a–326a.

Appellee—White—was aware, of course, of the FTC's investigation of its acquisition of Allis' stock. See affidavit of

Ward Smith, White Vice President and Secretary, submitted in opposition to Allis' motion to this court for an injunction pending appeal, note 5 *supra*.

29. *Cf.* McKesson and Robbins, Inc. v. Charles Pfizer & Co., 235 F.Supp. 743, 747 (E.D.Pa.1964), and MacIntyre, Antitrust Injunctions: A Flexible Private Remedy, 1966 Duke L.J. 22, 30–32, on weight to be given to FTC proceedings.

It should be noted that the key factors which the FTC has considered in the cases in which it has found conglomerate mergers to be illegal are "the elimination of potential competition, the gaining of competitive advantages that threaten to be decisive, the raising of the barriers to entry and the creation of anticompetitive reciprocity opportunities * * *." Reilly, Conglomerate Mergers—An Argument for Action, 61 Nw.U.L.Rev. 522, 534 (1966).

Trade Commission Act (15 U.S.C. § 45). * * * Appellant's Reply Brief, A17–A18.

## IV. Department of Justice Guidelines

In presenting its case concerning the probable anticompetitive effects of a White takeover, Allis-Chalmers has relied upon and sought support from the Justice Department's 1968 Merger Guidelines (set out in an addendum to appellant's brief), and has argued that a White-Allis combination is clearly violative of the portions of the guidelines dealing with mergers involving potential entrants, mergers creating a danger of reciprocal buying and mergers which entrench market power. I recognize that the primary purpose of the Guidelines is to indicate the standards being applied by the Department of Justice in determining whether to challenge corporate acquisitions and mergers under § 7, (subject to reevaluation of the standards by the present head of the Department's Antitrust Division, 5 CCH Trade Reg.Rep. ¶ 50,233, at 55,465), and that the standards do not purport to be a concise statement of the present status of the law which the courts are bound to follow. But because the Justice Department is obviously one of the principal government agencies charged with the duty of enforcing the antitrust laws, I think its position is entitled to some consideration, particularly when elements of the Guidelines find support in the developing case law. (*See, e. g.,* FTC v. Procter & Gamble Co., *supra*; United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); United States v. Penn-Olin Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); General Foods Corp. v. FTC, *supra*; United States v. Wilson Sporting Goods Co., *supra*.)

In light of the clear purpose of § 7 to preserve and promote meaningful competition, and because the structure of a particular market has a significant effect on competition in that market, the Department's merger policy focuses chiefly upon market structure. In dealing with conglomerate mergers, the Justice Department regards mergers involving potential entrants and mergers creating a significant danger of reciprocal buying as having sufficiently identifiable anticompetitive effects as to be the subject of relatively specific structural guides. The Guidelines are also concerned with conglomerate mergers involving acquisitions of a leading firm in a relatively concentrated or rapidly concentrating market where the acquisition may serve to entrench or increase the market power of that firm or raise barriers to entry in the firm's market. The Guidelines, issued May 30, 1968, are reported at 1 CCH Trade Reg.Rep. ¶ 4430; they were discussed in the *Wilson Sporting Goods Co.* case, 288 F.Supp. at 554 n. 14, and in United States v. Atlantic Richfield Co., 297 F.Supp. 1061, 1072–1073 (S.D.N.Y. 1969); referred to by Chief Judge Wright in American Smelting and Refining Co. v. Pennzoil United, Inc., 295 F. Supp. 149, 154, 157 (D.Del.1969); and commented upon in testimony before a Congressional committee by the present head of the Justice Department's Antitrust Division, 5 CCH, *supra* note 23 at 55,465.

In the *Wilson* decision, a well-reasoned compendium of the most recent legal principles applicable to the kind of antitrust problems we have here, the court said:

> * * * As the Supreme Court recognized in *Clorox*, it does not particularly aid analysis to discuss mergers in terms of their conventional labels as horizontal, vertical or conglomerate (386 U.S. at 570, 87 S.Ct. 1224, 18 L. Ed.2d 303). What is significant is the effect of the proposed merger upon the market structure of the relevant industries, and whether the merger will tend to lessen competition in the relevant market. Indeed, the governing facts in litigation involving a conglomerate merger are usually different from those in a horizontal or vertical situation, and their analysis required em-

phasis upon different market effects
* * *.

* * * * * * *
* * * We have pondered the issues raised by this case long and hard and have attemped to proceed with caution in the realization that we are dealing with probabilities, and that there is precious little in the law to guide us. We have heeded Professor Turner's admonition that "whatever antimerger standards are adopted, they should generally be more severe for horizontal (and vertical) than for conglomerate mergers." * * * 228 F.Supp. at 548, 567.

Basically, what is at stake in the instant appeal is the life or death of Allis, a viable independent company, eager to continue as such, pitted against White, an aggressive, fast-moving acquirer of many diverse businesses, particularly in the past few years. White's motives may be of the highest as designed to promote one concept of the American free enterprise system, but I am of the firm view that the proposed takeover is very likely to have anticompetitive effects in violation of § 7 of the Clayton Act. To deny preliminary relief could very well mean

the end of the road for appellant as an independent economic entity.

 In summary the proposed acquisition of Allis by White poses the probability of a violation of the antitrust laws because the acquisition threatens to:

(a) eliminate potential competition in the metal rolling mill industry and other relevant markets;

(b) diminish potential independent competition in other diversified markets; and

(c) enhance the power of a White-Allis combination to engage in reciprocal dealing.[30]

### V. Preliminary Injunction

In effectuating the decision that preliminary relief should be afforded in this case, it will be necessary for this court and the district court to determine the outlines of a preliminary injunction that will carry out the following objectives: (1) the preservation of the status quo pending a decision on the merits on a permanent injunction,[31] and (2) fairness and adequate protection to the litigants.

Pending final hearing and determination, therefore, the district court [32] shall,

30. While each case, of course, must stand on its own feet, we should not be oblivious to the current trends in our economy and to the possible impact of this case on the movement toward further economic concentration by merger. United States v. Pabst Brewing Co., 384 U.S. 546, 552, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966); United States v. Continental Can Co., 378 U.S. 441, 464, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964). The Statistical Report on Current Trends in Merger Activity, 1968, issued by the Bureau of Economics of the Federal Trade Commission in March, 1969, notes that "All previous levels of merger activity were eclipsed by developments in 1968." The report states further:

From the standpoint of public policy the most unique aspect of the current merger movement is its conglomerate character. In 1968 these mergers accounted for 84 percent of the number and 89 percent of the assets of all recorded large acquisitions. * * *

These proportions are higher than those of 1967 and continue the upward trend of recent years. * * * (Statistical Report, p. 3.)
Cf. Henderson and Henderson, The Race to Oligopoly, 1968 Duke L.J. 637.

31. As we said in United States v. Ingersoll-Rand Co., 320 F.2d 509, 525 (3d Cir. 1963):
* * * The present order does not determine the ultimate rights of the contesting parties but merely maintains the status quo until final hearing can be had and final determinations made in this intricate litigation * * *.

32. As stated in Carroll v. American Federation of Musicians, 295 F.2d 484, 489 (2d Cir. 1961), " * * * the detailed framing of the injunction is properly left to the District Judge." This is particularly appropriate here in view of the complex relationships already existing between the parties and the possibility that the situation may have shifted since

after holding such hearing as it deems necessary, enter a preliminary injunction which includes the following terms and conditions:

(1) permit Allis-Chalmers to hold its stockholders' meeting for the election of directors;

(2) prohibit White Consolidated from voting its shares of Allis-Chalmers stock or taking any action calculated to give it representation on the board of directors of Allis-Chalmers;[33]

(3) prohibit White Consolidated from taking any steps calculated to increase its stock holdings in Allis-Chalmers; and

(4) determine, pursuant to F.R.Civ. P. 65(c), the security to be furnished by Allis-Chalmers as a condition for granting the preliminary injunction.

The district court is authorized to incorporate such other terms and conditions in the preliminary injunction order which it considers appropriate so long as they are not inconsistent with those prescribed by this court. In addition, the district court may alter or modify any of the terms and conditions enumerated above if the parties, with the approval of the district court, so agree.

The district court is also requested to proceed as speedily as possible with the final hearing of this case on the merits.

The order of the district court denying a preliminary injunction will be reversed and the case will be remanded to the district court for further proceedings consistent with this opinion.

SEITZ, Circuit Judge (concurring).

While I concur in the result reached by Judge STAHL, I find it appropriate to set forth the basis for my vote for reversal in this separate opinion.

I think a preliminary injunction should issue in this case on the ground that there is a reasonable probability that after final hearing the district court might find that the merger would create a market structure conducive to unlawful reciprocal dealing in the rolling mills area. United States v. Ingersoll-Rand Co., 320 F.2d 509 (1963). I base my conclusion on the following recital in the affidavit of Thomas L. Dineen, an Allis-Chalmers General Manager:

"Allis-Chalmers' purchase of steel from the ten leading Blaw-Knox customers during the past four years have averaged $30,000,000 a year. None of the other three of the four principal suppliers of metal rolling mills * * purchases anywhere near this quantity of steel from these steel producers. Furthermore, none of the other three of the four principal suppliers of metal rolling mills purchases anywhere near as much steel from the steel industry as a whole as does Allis-Chalmers."

White Consolidated Industries challenges the affidavit as "the general, unsupported opinion of an Allis Chalmers General Manager * * *" While attacking the lack of factual specificity in the affidavit, nowhere does White Consolidated in its brief challenge the accuracy of the statements contained therein. I think the affidavit was sufficiently explicit to constitute for present pur-

---

the denial of the relief below in January, 1969.

In reversing a dismissal by the district court of a complaint for violation of § 7 brought by the Government, appealed directly to the Supreme Court under the Expediting Act, the Court said:

The District Courts, in the framing of equitable decrees, are clothed "with large discretion to model their judgments to fit the exigencies of the particular case." * * *. United States v. E. I. du Pont DeNemours & Co.,

353 U.S. 586, 607–608, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957).

33. For preliminary injunctions containing relief of this nature, see Muskegon Piston Ring Co. v. Gulf & Western Industries, Inc., 328 F.2d 830, 831 (6th Cir. 1964); Crane Co. v. Briggs Manufacturing Co., 280 F.2d 747 (6th Cir. 1960); Vanadium Corp. of America v. Susquehanna Corp., 203 F.Supp. 686, 697 (D.Del.1962).

poses the basis for concluding that Allis-Chalmers in a more substantial buyer of steel than all or most of the competitors of Blaw-Knox.

White Consolidated also contends that a comparison should be made between the yearly steel purchases by Allis-Chalmers from the principal buyers of rolling mills from Blaw-Knox, a White Consolidated subsidiary, and the total amount of steel sold by these buyers and that such a comparison shows that the 30 million dollars a year of steel purchases by Allis-Chalmers is not a significant amount (¼ of one per cent). It is my view, however, that there is a reasonable probability that the district court after final hearing may find that the proper comparison is between the steel purchasing power of Allis-Chalmers and that of the competitors of Blaw-Knox in the rolling mills field and that it would show that Allis-Chalmers is a substantial buyer of steel in comparison to them.

Under these circumstances a preliminary injunction should be issued because I am satisfied that the record contained the requisite showing of "probability of a lessening of competition and a showing of a reasonable probability of success on final hearing." United States v. Ingersoll-Rand Co., supra, at 525.

Because of my conclusion on the reciprocity issue I find it unnecessary to pass upon the other grounds developed in Judge STAHL'S opinion, nor do I express any opinion as to whether this court is entitled to take cognizance of the proposed Federal Trade Commission complaint, which was not issued until after the district court decision.

I note finally that we are now concerned only with the propriety of preliminary relief, and, as Judge Biggs noted in United States v. Ingersoll-Rand Co., supra, at 523:

"the facts, after final hearing, when the defendants have had a chance to consummate their defense or defenses in full, may appear of different sub-

stance and texture and possess very different legal effects."

I accordingly concur in the reversal of the order of the district court denying Allis-Chalmers injunctive relief and join in Judge STAHL'S direction that a preliminary injunction be issued by the district court in the form set forth in his opinion.

ALDISERT, Circuit Judge (dissenting).

I must respectfully dissent from the action taken by the majority.

Ours is an appellate, not a trial, court. And an appellate court has no authority to grant or to refuse a preliminary injunction. "It is to the discretion of the trial court and not to the appellate court, that the law has intrusted the power * * * to grant or dissolve an injunction, and the only question for an appellate court is: Does the proof clearly establish an abuse of that discretion by the trial court * * * for unless such abuse is clearly established, or an obvious error has occurred in the application of the law, or a serious and important mistake has been made in the consideration of the proof, the judgment of the trial court must be taken as presumptively correct." Stokes v. Williams, 226 F. 148 (3 Cir.1915), cert. denied 241 U.S. 681, 36 S.Ct. 728, 60 L.Ed. 1234.

I am compelled to express this delineation of trial and appellate court functions because I fear that, in their approach to this problem my distinguished brothers have assumed the broad prerogatives of a trial court instead of confining themselves to the limited scope of review vested in the appellate structure. For an appellate court to reverse a trial court's order refusing a preliminary injunction requires a determination that inappropriate law was applied to the facts or that clear error was committed in the finding of those facts. Neither circumstance becomes visible to me upon an examination of the trial record.[1]

1. See also Springfield Crusher v. Transcontinental Insurance Co., 372 F.2d 125

(3 Cir. 1967): "There is an abuse of discretion * * * when the action of

One question of law will turn this case: whether there was a showing by Allis-Chalmers of a reasonable probability of success on final hearing. The trial judge found that plaintiff had not met its burden; the majority would reverse, and say that the burden was met.

Where pure questions of law are concerned, the scope of review of an appellate court is unlimited. But this is so only where the question of law "has an existence independent" of findings of fact. United States v. Yellow Cab Co., 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150 (1949). Where the ultimate question of law depends upon findings of fact, the scope of review becomes severely circumscribed; an appellate court does not have carte blanche authority to pick and choose facts it would have found had it been the fact-finding tribunal; quite the contrary, it must accept the findings of fact of the trial judge unless there was clear error in the fact finding process.

These basic principles must govern our examination of the record and the action of the court below.

The majority's action in reversing the trial court and ordering the issuance of a preliminary injunction is bottomed on a finding that the acquisition of Allis-Chalmers by White Consolidated will in all probability enhance the power of a White-Allis combination to engage in illegal reciprocal dealing. In addition, my brother Stahl finds that a White-Allis combination will probably:

(a) eliminate potential competition in the metal rolling mill industry and other relevant markets, or

(b) diminish potential independent competition in other diversified markets.

None of these conclusions are based on pure questions of law with "an existence independent of findings of fact." Instead, they are findings having characteristics of both law and fact—the ultimate conclusions resting on preliminary findings of fact. As such, law and fact are inextricably interwoven. Had the equity side of the court not been chosen by Congress to process private anti-trust litigation, the basic findings found by the majority to be significant enough to overturn the decision of the trial court would have been questions for a jury. That equity requires the fact finding to be made by a judge, and not a jury, does not dilute the exclusive factual characteristics of these findings.

This threshold consideration assumes critical proportions because the findings of fact by the trial judge must be adopted by the reviewing court unless set aside under the "clearly erroneous" rule. Fed.R.C.P. 52(a).

In the anti-trust case of United States v. Yellow Cab Co., *supra*, 338 U.S. at 342, 70 S.Ct., at 179, the Supreme Court discussed this very issue and said: "It ought to be unnecessary to say that Rule 52 applies to appeals by the Government as well as to those by other litigants. There is no exception which permits it, even in an antitrust case, to come to this Court for what virtually amounts to a trial de novo on the record of such findings as intent, motive and design. While, of course, it would be our duty to correct clear error, even in findings of fact, the Government has failed to establish any greater grievance here than it might have in any case where the evidence would support a conclusion either way but where the trial court has decided it to weigh more heavily for the defendants. Such a choice between two permissible views of the weight of the evidence is not 'clearly erroneous'."

the trial judge is clearly contrary to reason and not justified by the evidence" ; New York Asbestos Manufacturing Co. v. Ambler Asbestos Air-Cell Covering Company, 102 F. 890 (3 Cir. 1900), quoted in Murray Hill Restaurant v. Thirteen Twenty One Locust, 98 F.2d 578, 579 (3 Cir. 1938): "The granting of a preliminary injunction is an exercise of a very far reaching power, never to be indulged in except in a case clearly demanding it; and the decision of a court of first instance, refusing such an injunction, will not, except for very strong reasons, be reversed by this court."

In United States v. National Association of Real Estate Boards, 339 U.S. 485, 495–496, 70 S.Ct. 711, 94 L.Ed. 1007 (1950), Mr. Justice Douglas stated: "It is not enough that we might give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent. [citations omitted] We are not given those choices, because our mandate is not to set aside findings of fact 'unless clearly erroneous'." [2]

There is yet another reason why I am constrained to emphasize our role as an appellate court: in exercising our function of review, we are restricted to an examination of only those matters presented to the trial court. Our assessment must be limited to the four corners of the record which was before the lower court. As its name suggests, an appellate review confers neither jurisdiction nor prerogative to reopen a case on the merits or to consider matters *dehors* the record.

Reassertion of this basic postulate becomes necessary because a significant portion of the facts and legal conclusions advanced by the appellant are derived from the allegations contained in a proposed Federal Trade Commission complaint [3] which was published after ·the

---

2. "That the trial court could have viewed the facts differently, or that we might perhaps have done so, if we had been the initial trier thereof, does not alone entitle us to reverse. Under Rule 52 (a) and its interpretation in the United States Gypsum Co. case, [United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746], there must exist a stronger basis for overthrowing a finding of fact than a mere difference in personal judgment. Such evidentiary weight and such convictional certainty must be present that the appellate court does not feel able to escape the view that the trial court has failed to make a sound survey of or to accord the proper effect to all of the cogent facts, giving due regard, of course, to the trial court's appraisal of witness credibility where that factor is involved." Nee v. Linwood Securities Co., 174 F.2d 434, 437 (8 Cir. 1949). See also Judge Learned Hand's observation in United States v. Aluminum Co. of America, 148 F.2d 416, 433 (2 Cir. 1945): "It is idle to try to define the meaning of the phrase 'clearly erroneous'; all that can be profitably said is that an appellate court, though it will hesitate less to reverse the finding of a judge than that of an administrative tribunal or of a jury, will nevertheless reverse it most reluctantly and only when well persuaded."

3. I must emphasize in the strongest of terms the extreme preliminary posture of the FTC proceedings. Even if it is proper for this court to take judicial notice of an FTC complaint (much less a "proposed complaint") made public after the proceedings in the district court, little or no weight should be given to it. A "complaint" does no more than signify

that "the Commission * * * [has] reason to believe that [a] person is violating or has violated any of the provisions of sections 13, 14, 18, and 19 of [Title 15]." 15 U.S.C.A. § 21.

The mere filing of such a complaint has little, if any more substantive significance than the filing of a complaint by a private citizen in a civil law suit. Indeed, the filing of the complaint is merely the initial step in the commencement of any action by the FTC against an alleged violator of the anti-trust law. 16 CFR § 3.11. There is no provision for any discovery until after the complaint is filed, and there is no requirement that the complaint be based upon a full-scale investigation of the alleged illegal operation in Part III of the FTC Rules of Practice, governing the nature of adjudicatory proceedings.

The tenor of the FTC Rules of Practice indicate that the bulk of the investigative and adjudicatory function is carried on in much the same manner as in the case of a private law suit. Section 3.12 provides for the filing of an answer, motion for a more definite statement of the charges, admissions, and the administrative equivalent of a default judgment for failure to file an answer. A prehearing conference is provided by § 3.21 for the purpose of simplifying and clarifying issues, considering amendments to the pleadings, expediting discovery, issuing subpoenas, etc. Section 3.41 guarantees a public hearing; § 3.42 provides for a presiding official at that hearing; § 3.54 prescribes the method of appealing from the initial decision of the hearing examiner to the Commission.

It should be noted that even after full review by the Commission, the decision is not yet considered final. Only after

decision of the lower court. This complaint is an ex-parte document disclosed by the FTC as the preliminary stage of possible governmental anti-trust action against White's acquisition of Allis-Chalmers.

I refuse to accept the quaint notion that the issuance of this "reason to believe" statement by the FTC has any legitimate place in the present appeal. My brother Stahl, nevertheless, while professing not to afford "excessive weight to the complaint," has freely, and I believe, improperly, incorporated the facts and conclusions of this proposed complaint into the very foundations of his opinion. For example, over 30 per cent of the footnotes supporting the opinion refer to matters contained in the FTC complaint *not to be found in the record below.*[4] I believe that such reliance on this extraneous material is unwarranted and unwise. There is no Congressional directive commanding it; there are almost two centuries of American judicial experience militating against it. For an appellate court to go beyond the record of a trial court and accept instead accusatory information of an agency of the executive branch of the government from an ex-parte preliminary proceeding is nothing short of an abdication of traditional concepts of independent judicial review.

This is not to say that a district court in determining the issue of whether a reasonable probability of success has been shown, should, ostrich-like, totally ignore the pending of an FTC proceeding, even if it has not become "final" within the meaning of 15 U.S.C.A. § 26(a).[5] Even then, however, the district court should not accept as gospel, either the conclusatory articulations of the prosecuting branch of this agency or facts which have not been tested in the crucible of an adversary proceeding.[6]

My quarrel, however, is not limited to this inordinate reliance upon matters not found in the trial record. Indeed, one of my major concerns stems from the cavalier treatment afforded those findings of fact made by the trial court. Not only were these findings not clearly erroneous, but in my view they were completely justified on the basis of the evidence presented.

The district court was confronted with gauging the anti-competitive effects of the proposed acquisition in three areas: (1) the electric home appliance market, (2) the machine shop capability and (3) the metal rolling mill market.

appropriate redress to the courts or waiver of that right as provided by 15 U.S.C.A. § 21 does the Commission's order become final.

4. See footnotes 9, 10, 12, 13, 15, 18, 19, 20, 21, 22, representing ten of the thirty-three footnotes. See also the extensive references and quotations in text of opinion.

5. See, *e. g.*, McKesson & Robbins, Inc. v. Charles Pfizer & Co., 235 F.Supp. 743 (E.D.Pa.1964), where it was emphasized that "extensive hearings" on the same issue before the court had been completed by the adjudication section of the FTC after a full evidentiary hearing conducted in an adversary fashion. See also MacIntyre, "Anti-trust Injunctions: A Flexible Private Remedy," 1966 Duke L.J. 22, 32, wherein the writer asserts that " * * * the findings of a quasi-judicial administrative agency charged with enforcing the anti-trust laws, *made after lengthy contest* and *after thorough*

*consideration of the evidence*, should completely satisfy the burden imposed upon a plaintiff in connection with a motion for provisional relief." (emphasis supplied)

6. Nothing in the schema of the anti-trust statute and the FTC Rules of Practice suggest that the issuance of a complaint or the publication of intent to issue one does in fact reflect the Commission's views on the merits of the alleged violation. At this stage of the proceedings, the Commission's task of fulfilling its impartial adjudicatory function remains to be accomplished. Although its prosecutory and adjudicatory functions are not bifurcated by statute, the allocation of duties to different units within the agency effectively separates the two. In addition, the FTC must comply with the requirements of § 5(c) of the Administrative Procedure Act, 5 U.S.C.A. § 1004 (c), in conducting adjudicatory proceedings.

In the first area of home appliances, I note that neither of my colleagues apparently disagrees with the district court's finding of insufficient evidence to establish Allis' entry into the market, and also, apparently, they concede that the district court had very little data to be impressed by the machine shop capability argument.

The critical area of review, therefore, emerges in the field of metal rolling mills. It is here that the majority part company with the conclusions of the lower court.

In concert, the majority suggests that there is a distinct anti-competitive danger of unlawful reciprocal dealing in the rolling mill-steel industries. My brother Stahl finds an equally anti-competitive effect on the potential entry of Allis-Chalmers into the metal rolling mill market and the potential product extension ramifications of White's acquisition of Allis' present capabilities in the field of rolling mill electrical components.

I disagree with these conclusions.

## I. Elimination of Potential Competition

In the many points of disagreement between appellant and appellee in the proceedings below, there was one matter about which there was no dispute: it was agreed that Allis could not make out a case of actual competition between the merging companies. Instead, it had to proceed on a theory of "potential competition," a newly emerging theory which in recent times has been embraced by the courts as a legitimate concern in anti-trust considerations.[7]

Potential, as distinguished from actual, competition must manifest itself in precise forms to come within the scrutiny of those who would enforce the spirit of the Clayton Act. Thus, where two firms market the same or substantially similar products in different parts of the country, their merger might present the question of a "substantial lessening of competition;"[8] or where two or more firms merge or form a joint venture for the purpose of entering a market presently dominated by others and it can be shown that but for the agreement each would have entered the new market separately, or that one would have entered independently while the other "remained at the edge of the market, continually threatening to enter;"[9] or where because of a long history of repeated entries into a particular market, it was reasonably likely to enter a specific area of that market.[10]

It becomes obvious therefore that the literal meaning of the word "potential" is not to be applied to the doctrine of potential competition in anti-trust law. He who would urge a case based on this doctrine must perforce prove more than a naked possibility of competition, or that a possible entrant into a market is capable of developing into an actual competitor. It would seem that to forestall a merger because the proposed combination would eliminate potential competition in the anti-trust sense, it is necessary to show first, a market so concentrated that potential competition provides one of the few checks on oligopolistic pricing and then: (1) that the acquired firm must be a significant factor in that market; and (2) one of the firms, in terms of its objective capabilities must appear to be a likely competitor of the other at some time in the future; or (3) as suggested by some commentators, the potential entrant must appear to be preeminent among the possible likely entrants, or that there are very few others in a similar position.[11]

7. See Davidow, "Conglomerate Concentration and Section Seven: The Limitations of the Anti-Merger Act," 68 Colum. L.Rev. 1231, 1241–49 (1968).

8. See, e. g., United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964).

9. United States v. Pen-Olin Chem. Co., 378 U.S. 158, 170, 84 S.Ct. 1710, 12 L.Ed. 2d 775 (1964).

10. FTC v. Procter and Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967).

11. Davidow, 68 Colum.L.Rev. at 1244. This standard was suggested by Donald

It is only with these principles in mind that we may appropriately examine the theory of the potential entry of Allis-Chalmers into a new market, potential product extension and potential reciprocity consequences.

This has been done in the discussion hereinafter set forth at length. And having done so, there is no basic area where I find myself in agreement with my brothers. I find the theories advanced on potential entry, product extension, and reciprocity to be devoid of precedental support or endorsement by any recognized commentator. Indeed, I view this approach to be an uncharted excursion into a sensitive area of the American economic community, embracing a truly radical concept of the doctrine of potential competition in anti-trust law; a theory which seems to hold that so long as there exists a mere possibility of entry in a market, or a mere possibility of product extension, or a mere possibility of reciprocity, then the proposed merger must be enjoined. I cannot accept this hypothesis; nor, as previously observed, has any previous court decision or commentator suggested it.

I must also regretfully observe that to support this novel theory, it has been necessary to embrace self-serving declarations of opinion by the appellant's officers as evidence of factual data in critical areas which should have demanded clear analytical proof instead of subjective impressions. Consequently, even were I to accept this unique theory of anti-trust law, I would still be constrained to dissent on the ground that the trial record was deficient in factual support for the theory, heeding always the doctrine that the weight to be given such expressions of opinion is the province of the trier of fact.

## II. Reciprocity

Although I agree with the majority's statement of the law governing anti-competitive effects of reciprocity,[12] I find the

F. Turner, former head of the Justice Department's Antitrust Division. See Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1363 (1965). It is to be noted that the instant case is atypical in that the alleged potential entrant is not the acquiring company, as in the usual case, but the acquired company. This presents a more difficult burden of proof problem: the motivation to prove a future intention to enter and thereby block the merger via the anti-trust laws becomes obvious. Because of this, it is of even greater importance that the alleged potential entrant be judged in terms of its *objective capabilities* as suggested by Mr. Davidow. It is one thing for Allis-Chalmers to allege its intention to enter any of a given number of market areas presently occupied by White or one of its subsidiaries, in order to prevent the takeover, but it is quite another to present objective evidence of this intention, and to demonstrate the capability to do so. In this respect, Chief Judge Wright was not content with Allis-Chalmers' self-serving statement of intention to enter the metal rolling mill area, but insisted upon objective proof of capability to do so:

"However, the only evidence before the Court· of Allis-Chalmers potential competition in this field is an assertion by Allis-Chalmers Management that such entry is contemplated. Aside from the fact that Allis-Chalmers now manufactures and constructs papermaking machinery, Tr. 11–12, there is nothing in the record to confirm that Allis-Chalmers has the technological.capacity to enter this market nor is there evidence to confirm financial capacity to enter, the ability of the market to support an additional competitor, or Allis-Chalmers' serious consideration of entry." 294 F.Supp. at 1268.

12. In FTC v. Consolidated Foods, 380 U.S. 592, 594, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965), the Supreme Court defined reciprocity as "A threatened withdrawal of orders if products of an affiliate cease being bought, as well as a conditioning of future purchases on the receipt of orders for products of that affiliate * * *." The Court affirmed the Commission's decision that § 7 was violated when Consolidated, a giant food wholesaler, acquired Gentry, a smaller company which sold dehydrated onion and garlic to certain of Consolidated's suppliers. In no uncertain terms, the Court condemned the practice of obtaining a competitive advantage through reciprocal buying practices: "We hold at the outset that the 'reciprocity' made possible by such an acquisition is one of the congeries of anticompetitive practices at which the

present record devoid of sufficient facts to support a preliminary injunction of the White-Allis acquisition.

From the barest of facts, the majority have conjured vivid overtones of reciprocity in the rolling mill-steel industries. The only statistic capable of being gleaned from the record is that Allis-Chalmers purchases approximately $30,000,000 of steel annually. To this my brother Stahl adds a figure, not in the record below, of the annual steel purchase of Blaw-Knox; and then a conclusion is proffered, without factual support, that "A White-Allis combination would buy a far larger amount of steel than any of Blaw-Knox's competitors in the rolling mill market." [13]

Even if this were true, which, I emphasize, cannot be determined on the present state of the record, I fail to see how a conclusion of anti-competitive reciprocity follows. Nearly every acquisition has, to some extent, elements of reciprocity. This is especially true where, as here, the industries involved are consumers of the basic component steel.

But the vice of reciprocity, i. e., the ability to transform substantial buying power into a weapon against competitors less favorably situated, can only be determined in the context of the market involved. Otherwise, all that is portrayed is the "potential for reciprocity." Cf. *Consolidated Foods, supra* footnote 12, where the company to be acquired, Gentry, along with one competitor controlled 90 per cent of the dehydrated garlic and onion market.

The necessity for detailed information was emphasized in the concurring opinion of Mr. Justice Stewart in FTC v. Consolidated Foods, *supra*, at 603–605, 85 S.Ct., at 1227–1228:

"Before a merger may be properly outlawed under § 7 on the basis solely of reciprocal buying potentials, the law requires a more closely textured economic analysis. * * * The Act does not require that there be a certainty of anticompetitve effect. But that does not mean that the courts or the Commission can rely on slipshod information confusingly presented and ambiguous in its implications. The law does not require proof that competition certainly will be lessened by the merger. But the record should be clear and convincing that the requisite probability is present."

The trial record on this point is anything but clear and convincing; it suffers from factual anemia and an examination discloses that it is symptomatic of only a bare suspicion of possible reciprocity. As the Supreme Court has stated, we are concerned with "probabilities, not certainties." The test is exactly that: probabilities of reciprocity, not possibilities. "We do not go so far to say that any acquisition, no matter how small, violates § 7 if there is a probability of reciprocal buying. Some situations may amount only to de minimis. But * * * here, the acquisition is of a company that commands a substantial share of a market." Consolidated Foods, 380 U.S. at 600, 85 S.Ct., at 1225.

### III. Potential Entry Into the Rolling Mill Market

Based on its review of the evidence, the district court determined:

" * * * Allis-Chalmers asserts that its entry into the manufacture and con-

---

antitrust laws are aimed. The practice results in 'an irrelevant and alien factor' * * * intruding into the choice among competing products, creating at the least 'a priority on the business at equal prices.'" 380 U.S. at 594, 85 S.Ct., at 1221–1222.

13. The FTC proposed complaint, not in the record, states that Blaw-Knox purchases $42,000,000 of steel per year. Although

I consider it inappropriate to consider this item because it is not in the record, it may be considered with another figure, set forth in appellee's brief, also not in the record: the total annual steel purchases in the United States amounts to 13 billion dollars. Viewed in this light the $30 million purchases of Allis-Chalmers amounts to $\frac{1}{4}$ of one per cent of the total; the Blaw-Knox figure would be $\frac{1}{3}$ of one per cent.

struction of metal rolling mills—an area in which Blaw-Knox is active—is sufficiently probable to warrant restraint of White's takeover. However, the only evidence before the Court of Allis-Chalmers potential competition in this field is an assertion by Allis-Chalmers management that such entry is contemplated. Aside from the fact that Allis-Chalmers now manufactures and constructs paper-making machinery, Tr. 11–12, there is nothing in the record to confirm that Allis-Chalmers has the technological capacity to enter this market. Nor is there evidence to confirm financial capacity to enter, the ability of the market to support an additional competitor, or Allis-Chalmers' serious consideration of entry. Finally, the record does not indicate that Allis-Chalmers, by the nature of its present business, stands close enough to the edge of the metal rolling market to exert a competitive influence on others in that industry."

My brother STAHL concludes, however, that "further inquiry into Allis' status as a potential entrant into this industry" is warranted. The form of this further inquiry is a discussion of what is described as an "uncontroverted affidavit [that] Allis manufactured components and sub-assemblies for *complete* metal rolling mills." An examination of this affidavit, however, reveals only "some information concerning components and sub-assemblies." And an examination of the source cited in the affidavit, Exhibit QQ, demonstrates that the supportive data itself contradicts the opinion expressed in the affidavit. Far from corroborating the general claim in appellant's affidavit of "possible manufacture for them of a complete 10 or 12 inch metal rolling mill," this exhibit merely discloses that Allis-Chalmers sold two heavy-duty tool container block assemblies for use at Alcoa on helicopter blades as a sub-contract with Blaw-Knox and negotiations with Blaw-Knox and not a contract for a $50,000 order for an ingot transfer car assembly for Ford Motor Corporation.[14]

The only other factor relied upon to buttress the conclusion that "further inquiry" into this area is required, is a vague self-serving declaration by one of the appellants' officers that Allis-Chalmers has been secretly negotiating with an unidentified European firm to obtain a license to manufacture an unidentified casting process and unidentified machinery for producing steel slabs. This nebulous statement can hardly be classified as compelling evidence of the probable entry of Allis-Chalmers into the rolling mill market. Furthermore, the analysis ignores such critical determinations as Allis' questionable financial and technical ability to enter this market, a market which is conceded at another point to possess "already significant barriers to the entry of others."

---

14. Reference is made to page 146a of the record. This is an affidavit by Allis' general manager of paper machinery: "In the custom machine end of the Appleton business, we have manufactured components and sub-assemblies of complete rolling mills. This work has been done for Blaw Knox. Examples of such work for Blaw Knox are shown in Exhibits II, JJ, KK and LL."

An examination of these supportive exhibits is a fascinating experience. Where one would expect statistics, tabulations, and specialized data concerning "complete metal rolling mills * * * done for Blaw Knox," these particular exhibits, together with NN, OO, and PP, are nothing more than photographs of pieces of machinery, with no description, no legend, and no identifying data whatsoever!

An examination of Exhibit QQ reveals only this meager information:

"We have an excellent working relationship particularly with Blaw Knox Company of East Chicago which is the Foundry and Mill Machinery Division of White Consolidated Industries."

"Industrial sale is an integral part of the business of the Paper Machinery Department. The products manufactured for Blaw Knox are especially desirable since they afford optimum utilization of our facilities and equipment in the areas of Foundry, Fabricating, Machinery and Assembly."

A discussion of the block and car assemblies mentioned above then follows.

After examining this sketchy record, self-contradictory in part and notably devoid of persuasive facts, I disagree completely that the trial judge clearly erred in his finding that there was insufficient evidence to establish Allis-Chalmers' potential entry into the rolling mill market. This is a crucial point. Only by overturning the lower court's finding of fact that Allis did not intend —or really could not seriously intend with its present capabilities and financial picture—to enter this market can one justify the conclusion that a White takeover could substantially lessen competition in the metal rolling mills market by eliminating Allis as a future potential competitor.[15]

### IV. Product Extension

Stripped of explanatory materials, my brother Stahl's analysis of "product extension" and "entrenchment" is nothing more than a conclusion that a mere possibility of product extension will probably generate anti-competitive effects outlawed by § 7 of the Clayton Act. It becomes necessary to put this problem in its proper perspective. In the context of anti-trust considerations, product extension is not *malum in se*. And it is not a factor which has significance in and of itself. It assumes importance only when, by reason of the conduct of the acquired or acquiring party, there occurs such a shift in market power as to produce anti-competitive effects. The law usually is not concerned with ordinary transfers of market power. It is only when the transfer occurs in a market structure so concentrated as to pose a serious threat of creating or enhancing a present monopolistic or oligopolistic market position that it becomes circumspect; and it becomes so because of the probability that competition could be substantially lessened.[16]

Product extension becomes important in the context of anti-trust considerations only when it becomes a means whereby the proposed merger might enhance market power to the point where it becomes "entrenched." It is not difficult to predict the probable anti-competitive effect of a takeover by a larger firm of a smaller firm whose product is in a market already concentrated or oligopolistic. Such a merger could increase the existing concentration in the market of the acquired firm by strengthening the position of the smaller, acquired firm.[17] Thus, the typical entrenchment case arises in an acquisition of a dominant firm in a relatively small industry by a much larger firm. The market position of the smaller firm may become "entrenched" through predatory pricing, so-called "deep pocket practices" of the parent,[18] through various promotional

15. Because I conclude that the lower court's finding that Allis did not objectively intend to enter the rolling mill market was not clearly erroneous, I do not feel it necessary to detail the reasons for an additional belief that neither of the other two requirements for a § 7 violation based on the elimination of potential competition were satisfied. Suffice it to say: here there was no proof at trial that Blaw-Knox was a significant factor in a market so concentrated that potential competition provided one of the few checks on oligopolistic pricing; that Allis was one of the most likely or most important potential entrants in the metal rolling mills market; or that there were very few others in similar positions at the brink of potential entry.

16. See the opinion of Judge Learned Hand in United States v. Aluminum Co. of America, 148 F.2d 416 (2 Cir. 1945). The law of product extension is based on Judge Hand's thesis that business conduct having the effect of entrenching a monopoly is violative of the anti-trust laws.

17. See, *e. g.*, FTC v. Procter & Gamble, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); FTC v. Consolidated Foods, 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965); General Foods v. FTC, 386 F.2d 936 (3 Cir. 1967), cert. den. 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968); Ekco Prods., Inc., Trade Reg. Rep. ¶ 16,956 (FTC 1963), aff'd, Ekco Prods. Co. v. FTC, 347 F.2d 745 (7 Cir. 1965); Reynolds Metal Co. v. F.T.C., 114 U.S.App.D.C. 2, 309 F.2d 223 (1962).

18. Reynolds Metal Co. v. F.T.C., *supra*, footnote 17, at p. 229. The essence of this theory is a presumption that the

advantages not available to the smaller competitors in the market of the acquired company,[19] or because of the advantage gained through "product extension"— i. e., the ability of the combined companies "to offer a complete line of equipment to its consumers and to further enhance its position and dominance in the market * * *." [20]

In the case at bar we do not have the typical case of a smaller dominant company being acquired by a larger outside company. The record indicates variously that Blaw-Knox controls between 11 and 20 per cent of the metal rolling mills market. Allis-Chalmers, the acquired company, has none of this market. It is not in the metal rolling mill business. Although it does supply electrical equipment to this market, it is not even a prominent supplier. Suppliers of electrical equipment, with their respective shares of the market, are: General Electric, 45%; Westinghouse, 40%; Allis-Chalmers, 6%; Reliance Electric, 5%; Cuttler-Hammer, 3%; and Clark Controller (A. O. Smith), 1%.

Although there is an assertion that over the past five years Allis has supplied approximately a half-million dollars worth of such equipment to Blaw-Knox annually, referring to App. 199a for authority, that same source describes these sales in this significant language: "Allis-Chalmers supplies a very small fraction of such [electrical drive devices] components."

Nonetheless, the conclusion is proffered that in the area of product extension, "the probable anticompetitive effects of an Allis-Chalmers-Blaw-Knox (i. e., White) combination are significant." This conclusion is based substantially on the interpretation and application of three decisions: FTC v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); General Foods Corp. v. FTC, 386 F.2d 936 (3 Cir. 1967), cert. den. 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968), and United States v. Wilson Sporting Goods Co., 288 F.Supp. 543 (N.D.Ill.1968).

Judicial application of the product-extension concept to the field of anti-trust legislation is far from crystallized. While the relevancy of anti-trust legislation to this area cannot be seriously questioned, this court has already said in *General Foods* that "we do not read *Clorox* as proscribing, per se, all mergers labeled 'product extension mergers'."

I do not consider the facts in *Clorox*, *General Foods* or *Wilson Sporting* comparable to the case at bar. In all of these cases, the corporations involved, both the acquiring firm and the acquired, were dominant in their respective industries. For example, in *Clorox*, the acquiring firm, Procter & Gamble, was the giant of the industry, accounting for over 50 per cent of the packaged detergent market and the nation's largest advertiser of products. In addition, the firm to be acquired, Clorox, was the "leading manufacturer of household liquid bleach, with 48.8% of the national sales." 386 U.S. at 571, 87 S.Ct., at 1226.

Similarly, in *General Foods*, this court was confronted with the prospect of General Foods, one of the largest producers of packaged foods in the United States and the third leading national advertiser, merging with S. O. S., the copartner of an industry duopoly, and recognized as occupying "a monopoly position in many areas."

In the last of the trilogy, *Wilson Sporting Goods*, the merger involved the ac-

"rich parent" has the financial wherewithal to sell at prices approximating cost or below, and thus to "undercut and ravage the less affluent competition." Again, this argument obviously has much more forcefulness if the acquiring company fulfills the "rich parent" characterization.

19. This theory was suggested in FTC v. Procter & Gamble, *supra*, footnote 10.

The fear here is that the parent, through low-unit cost bulk advertising could cause the acquired firm to become an even more dominant participant in an already concentrated market.

20. The best example is probably our own case of United States v. Ingersoll-Rand, 320 F.2d 509, 524 (3 Cir. 1963).

quisition of the "leading manufacturer and seller of gymnasium equipment in the country," Nissen Corporation, by Wilson Sporting Goods Company, which was the nation's prominent producer and marketer of sporting goods.

In contrast to the giants represented in these cases, the present appeal involves midgets. If Blaw-Knox controls between 11 to 20 per cent of the rolling mill market, it is by no means the industry's dominant figure. Allis-Chalmers has none of it. And even if we are to consider Allis' share of the market for electrical equipment for rolling mills, its share is only 6 per cent, a feeble percentage when compared to the 45 per cent and 40 per cent share commanded by General Electric and Westinghouse. Nevertheless, from these meager facts, the majority conclude that the probable "anti-competitive effects * * * are significant."

Upon this emaciated skeleton of facts, the cloak of anti-competitive effects just does not fit. There is no takeover by a larger firm of a smaller one whose product is in a market already oligopolistic;

there is no evidence that the market position of the combined firm may become entrenched by predatory pricing or promotional advantages not available to other competitors of the acquired company.

There is only one attempt to inflate the miniscule of facts presented at trial into a full blown *Ingersoll-Rand* argument: because Allis has 6 per cent of the electrical control market, this, when added to Blaw-Knox's share of the rolling mill market, would produce anti-competitive effects to the prejudice of other rolling mill producers. There was no specific evidence presented at the trial below that the Allis-Blaw-Knox merger would afford advantages not possessed by present rolling mill producers. Other than citing them by name with their respective shares of the market, the record studiously avoids a description of their production and sales capabilities.[21] There is no proof that the transfer of market power through product extension advantages will be of such magnitude that Blaw-Knox will become "entrenched." [22]

21. There was an expression of opinion by one of Allis' officers—a naked statement with no supportive data—that "should Allis-Chalmers and Blaw Knox be combined, the resulting firm would be the only supplier which could furnish complete-unit responsibility for metal rolling mills and electrical drive and control systems." 112a. An attempt has been made to equate this self-serving declaration with the force and effect of proved fact. I disagree. Saying it does not make it so.

22. These observations on the product extension argument are also applicable to the contentions that there are product extension consequences in the construction equipment and steel castings field.

My brother Stahl's discussion of construction equipment is most meager. We are not sure what standard is being suggested where, here, as elsewhere, it is stated " 'the product extension' aspects of a White acquisition are deserving of scrutiny in light of Allis' position as a leading manufacturer of a broad range of construction equipment and its network of dealers who carry a wide range of such equipment." The trial

court has already given this issue its "deserved scrutiny." It made findings of fact adverse to the appellant, possibly because appellant did not press this point. Factual references to this point on the trial record are conspicuous by their absence. The answer to the fear of product extension in asphalt paving and batching equipment is the same as that proffered in the rolling mills discussion above. The appellant's own evidence indicates that Blaw-Knox, "in the universe of asphalt plants, pavers and related equipment, [ranks] about sixth with 7 to 8% [of the market share]. With Standard Steel, [a newly acquired company] Allis-Chalmers will rank fifth with 9% in that product category." 137a.

I see no reason for "further scrutiny." Facts are facts. It is significant that the cited product extension cases all refer to dominant percentage shares of a concentrated market of the acquired (or combined) company. Blaw-Knox's 8% share of the asphalt paving market and the Allis-Chalmers' share of the batcher market do not begin to approximate such control, especially in the absence of proof of concentration in this field.

## V. The Significance of Market Share and Concentration Data

Both my brothers have been careful in their opinions to stress the preliminary nature of this proceeding, as if to intimate that somehow this factor absolves the appellant of demonstrating that the findings of fact were "clearly erroneous" or that the district court erred in construing applicable legal standards under the anti-trust laws.

Conceding that the same quantum of proof was not required at the preliminary injunction stage as would be at the trial on the merits, I suggest that the appellant was obliged to present at least some evidence of relevant facts, figures and statistics describing the affected markets and the shares of these markets commanded by the companies involved. I find it most difficult to justify any reversal of the trial court on the basis of an *Ingersoll-Rand* argument without the presence of such essential factual data.

In this respect, I find it impossible to reconcile a prefatory statement professing not to deal "expressly with the matter of each party's share of the market in the lines of commerce" with the conclusion that a combined market would "account for a significant share" of that market. This incongruous result is in large measure due to a blend of fact and philosophy which characterize the appellant's case. Lacking adequate factual support for its thesis of anti-competitive oligopoly, Allis-Chalmers attempted to bottom its case upon a theory of economics, asserting this hypothesis: because White Consolidated is a large corporate conglomerate, its size, without more, will produce anti-competitive effects in affected markets.

This hypothesis is nothing more than a restatement of a "Brandeisian bias in favor of human sized institutions," a nostalgic attempt to equate bigness with badness.[23] But Congress has not written this theory into its anti-trust legislation; nor should any court attempt to legislate such a doctrine into it. So long as the legislative proscription of anti-trust activities turns on factors beyond the mere "possibilities" of anti-competitive effects, the courts must be diligent not to substitute the Brandeisian bias for sound analysis.

The characterization of a company as a "large conglomerate" should not impose a presumption of anti-competitive guilt. Section 7 of the Clayton Act nowhere so provides. It is the company's activities—not its form and size—which the Congress has sought to regulate. And judicial enforcement of this regulation should only be had upon a factual determination that the activity "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C.A. § 18.

Moreover, this factual determination should result as the synthesis of an adversary proceeding. It should not be affected in any way by the ex parte actions of the FTC, which in the context of private anti-trust suits is a stranger to the litigation. I reject any inference that the issuance of a proposed FTC complaint is prima facie evidence of illegality, justifying preliminary injunctive relief in this case, and presumably others.

But one other aspect of the majority's action causes me no little concern. Not only has there been an exercise of trial court prerogatives at this preliminary stage of the litigation, some of the language expressed by my brother Stahl is so sweeping and conclusatory that I fear little remains for an objective determination of the basic issues at the trial still to be had. In substituting philosophy for fact, ex-parte declarations for evidence, such analysis comes dangerously close to molding a cast for the final result, effectively circumscribing the scope of a case yet to be tried on the merits—despite protestations concerning the preliminary nature of this adjudication. This is amply demonstrated by the fol-

**23.** See Davidow, 28 Colum.L.Rev. at 1285.

lowing statement contained in the majority opinion:

"Basically, what is at stake in the instant appeal is the life or death of Allis, a viable independent company eager to continue as such, pitted against White, an aggressive, fast-moving acquirer of many diverse businesses, particularly in the past few years."

First, I question the validity of this conclusion, reached without a trial, that Allis-Chalmers cannot survive as an ongoing business if acquired by White. Moreover, I reject the assumption underlying this statement that the judicial branch has been entrusted with the task of policing the economy, preserving the "viability" of the corporate structure. Such a role cannot be justified within the framework of existing anti-trust legislation. It is only where the "life or death" of a corporate entity has anti-competitive effects that judicial intervention is proper.

The district court concluded that Allis-Chalmers failed to establish a probability of anti-competitive effects. On the basis of the law and the evidence, I do not find that conclusion clearly erroneous.

I would affirm the judgment of the lower court for the reasons set forth in the opinion of the learned trial judge.

Accordingly, I dissent.